In the Matter of the Application of DEL BALSO HOLDING COR-
PORATION, Petitioner, for an Order of Mandamus against JOHN
McKENZIE, as Commissioner of Docks of the City of New York,
Respondent.

Supreme Court, Special Term, Bronx County, June 30, 1937.

*Leo Kaplan*, for the petitioner.

*Paul Windels, Corporation Counsel* [*Alfred D. Jahr* of counsel], for the respondent.

McLAUGHLIN (CHARLES B.), J. This case involves the fixing of the high-water line at a point on Westchester creek. For years the city used its own high-water line as found by its dock department. That is the line the court finds in this proceeding. The testimony concerning the Federal government high-water line is too contradictory and too uncertain to change the line that the city has used for years.

This matter is now before this court upon an alternative order of mandamus directed to the defendant, as commissioner of docks of the city of New York, to show cause why a peremptory order of mandamus should not issue in favor of the petitioner Del Balso Holding Corporation, permitting it to construct a pier in Westchester creek. The case has been to the Court of Appeals but has been sent back for a new trial on the one question of whether or not the petitioner owns any upland which would give it riparian rights in the creek. (*Matter of Del Balso Holding Corp.* v. *McKenzie*, 271 N. Y. 313.) That is concededly the only issue now before the court.

The determination of this question rests on the ascertainment of the mean high-water line at the *locus in quo*. The city owns the land between high- and low-water mark, and petitioner claims that he owns the upland, that is, the land abutting on the mean high-water line.

The high-water line must be established from the testimony of the various witnesses and the maps and exhibits. The city's witnesses on this trial have testified to four different high-water ranges. Heyer to a 6.86 foot range; Lintner to a 6.81 foot range; Biderman to a 7.2 foot range; and McCartney to a 7.003 foot range. The first two of these, it can be seen, are practically identical with the dock department line of 6.8 feet, relied on by petitioner. Any of these three ranges would give the petitioner some upland, whereas the 7.2 foot and 7.003 foot lines would be farther inshore and would not give the petitioner any upland. There appears at the end of the city's brief a compact key map showing the 7.2 foot and 6.8 foot lines. This map is now placed in evidence by the court. (Court Exhibit I.) If the high-water line designated as D is accepted as accurate the petitioner is unquestionably the owner of upland, and its position is sustained. This line D is the dock department line which, as we have stated, the city for years has accepted as the high-water line at this point.

This same high-water line was used by the city on its damage maps used in condemning various streets in the section of petitioner's property. The city now rejects this line and attempts to establish four different lines determined by the Federal government at different times which, while they vary only slightly from the dock department line, would show no upland and thus defeat petitioner's claim.

On the trial the city sought to prove the absence of ownership of upland in the petitioner by endeavoring to locate the high-water line inshore of the boundaries of upland claimed by the petitioner. The first witness for the city, Andrew B. Heyer, a civil engineer in the employ of the Federal government, located the high-water line inshore of the boundaries of the property claimed by the petitioner. This witness delineated on defendant's Exhibit "C" the high-water line as it existed in 1910 and 1911. Defendant's Exhibit "C" is a map prepared by Federal engineers for the Federal government in the ordinary course of business. The net result of Heyer's testimony was to place the high-water line in 1910 and 1911 as running in a general direction from east to west along the northeastern corner of Lacombe and Zerega avenues in such a position as to exclude the petitioner from ownership of any upland at the *locus in quo*. But Heyer did testify, on direct examination, to an average range of tides in the vicinity of the *locus in quo* of 6.86 feet. We quote from the testimony: " Q. Did you know what the range of tides is in that particular vicinity, Mr. Heyer? A. I would say about, the average range is 6.86. Q. 6.86, that is the average? A. That is the average range. Q. The high tides would go much higher than that? A. Oh, the high tides would go, I would say, about eight and a half. Q. When you talk about the tide ranges, you mean the differences between the high water line, high water mark, and low water mark of the particular time, is that correct? A. That is correct."

But if we accept this tide range and apply it to the key map it will be seen that this range would place the high-water line within the boundaries of petitioner's property. In fact, 6.86 is practically the same average range as found by the dock department and as used by it in fixing the high-water line.

Frederick A. Biderman, a civil engineer, also testifying for the city, stated that an official publication of the Federal government set the mean tidal range for Westchester creek, which would include the *locus in quo*, at 7.2 feet. For the purpose of illustrating the location of the high-water line based upon this range of tide, defendant's Exhibit "K" was introduced. This exhibit shows the 7.2 high-water line as corresponding generally with the location

of the high-water line as placed by Heyer. In fact, in at least one place it is delineated as being further outshore than the 6.86-foot line of Heyer. This in itself presents a contradiction, one witness for the city locating a high-water line based upon a 6.86-foot tidal range in approximately the same general location as another witness for the city who bases his location of the high-water mark on a Federal government calculation of 7.2 feet. On this same exhibit introduced by the city there also appears a line purporting to be the dock department high-water line of 1897. This line is generally further outshore than the 6.86 line of Heyer or the interpolated 7.2 line of Biderman, and is, strange to say, based upon a mean tidal range of 6.86 feet, according to this exhibit and also according to the testimony of Biderman.

At the second hearing the witness McCartney for the city testified to a mean tidal range of 7.003 feet. This was the third different range set up by the city's witnesses and was allegedly based upon observations of automatic tide-gauge readings taken in Westchester creek over a period running from June 14 to August 31, 1930. But viewed in the most favorable light for defendant this testimony would establish such a range of tide only for the duration of the period during which the automatic tide gauge was used. The witness stated that observations must be made for many years to establish the tide range.

" Q. And it is only over a period of observations for many years that we are enabled to fix the tide ranges and mean low water mark? A. Well, naturally, the longer the observations, it irons out any bumps that get into these curves once in a while."

Tide gauges were maintained for a number of years at Fort Schuyler but only for a short period at Westchester creek. In determining the mean tidal range at the point in question at Westchester creek, the results of the observations at Fort Schuyler were employed on the theory that the two places were apparently subject to the same influences.

" Q. Now, what makes you say that the tide at Westchester Creek and the tides at Fort Schuyler require the same correction? A. Well, because of the — well, it is like this: If the changes in the heights of the high and the depths of the low water are created by any other cause, other than the tide producing forces — say such things as weather; that is, in New York Harbor with a westerly wind we have low water, abnormally low, with an easterly wind we have high water. Well, now, we believe the same wind that would affect the gauge at Fort Schuyler, at Throggs Neck, would also affect the gauge at Westchester Creek."

It is, therefore, obvious from the testimony of this witness that the tidal range established by the Federal government at the point in which we are interested is by no means entirely accurate, for it was obtained as a matter of convenience by theoretically applying observations obtained at a different point. Local weather conditions and winds at Westchester creek differing from those at Fort Schuyler would make the calculated tide range inaccurate. The next witness for the city, Lintner, adopts a different tidal range. He testified: " Now the United States Government in their survey, since they use a different reference plane, they had an elevation on this same bench mark or same fixed point at 12.08, but they had a range of tide at 6.81." It, therefore, appears that the testimony of the city's witnesses as to the tidal range was contradictory. At best, all that we can get from the testimony of these witnesses called by the city are four different high-water lines. All four cannot be correct. The testimony of these witnesses indicates that there were undoubtedly inaccuracies in determining the various high-water marks arrived at.

On the other hand, the petitioner relies on the high-water line as established by the dock department of the city of New York, which line the city itself used prior to this trial. In addition, the petitioner offers the testimony of a number of witnesses who testified from their personal observation as to the position of the high-water line.

Petitioner's Exhibit 11, which is a topographical map made before 1899, indicates, according to Mr. Hefele, who was a witness for the petitioner, a high-water line derived from dock department sheets. This high-water line corresponds to the dock department high-water line of 1897 which, according to the witness Biderman, was based upon a range of tide of 6.8 feet. Acceptance of this high-water line of the dock department as the true line of mean high water would give the petitioner herein some upland at the *locus in quo*. Petitioner's Exhibit No. 10, which is a final map of the section of the Bronx which includes the *locus in quo*, indicates a mean high-water line crossing the property claimed by petitioner in such a manner as to confirm the petitioner's claim to some upland. Petitioner's Exhibits Nos. 10 and 11 are official maps of the city of New York. The benefit map of Lacombe avenue (Petitioner's Exhibit No. 14), a copy of an official map used by the city for the purposes of assessment, also confirms the petitioner's claim by reason of its location of the line of mean high water. Petitioner's Exhibit No. 16, which is the benefit map of the Zerega avenue taking, also lends weight to the petitioner's claim to upland

by reason of its showing what is apparently a line of mean high water touching upon the property claimed by the petitioner. Petitioner's Exhibit No. 18 also shows a line corresponding in position and direction to the dock department high-water line of 1897.

The dock department is charged by law with the control of the water front. The tideway and other lands under water belonging to the city are under its care and supervision. When it establishes a line of mean high water it must, of necessity, do so not merely in relation to the waterway involved, as is frequently the case when a survey is made by the Federal government, but it must also take into consideration in the fixation of its high-water lines the fact that such fixation will in many instances involve title to upland. It is not disputed that if the true high-water line is based upon a range of tide of 6.86 feet or less, then there is upland owned by the petitioner in front of the bulkhead line where the pier is sought to be erected. The applicant, if he owns that, is a riparian owner and is entitled to access to the navigable part of Westchester creek. The existence of some upland at the point in question is also established by the testimony of petitioner's witnesses Filipone, Sayers, Donnelly and Broker. Filipone, the secretary of petitioner, identified the dock department's line as coinciding with the high-water line as he remembered it from personal observation. Sayers, an attorney, who has been familiar with this property for many years, testified that the high-water line in 1925 was that claimed by the petitioner. He stated that at that time the land inshore had salt hay growing on it; that the line was indicated by an ancient wall, and that outshore of that line sedge was growing, whereas inshore there was dry land. This grass or salt hay, as he called it, does not grow outshore of the high-water line. Donnelly, also an attorney, testified that he was familiar with this property since 1904; that while he did not recall the wall referred to by Sayers there was some protection beyond the sedge which marked the end of the salt meadow or salt hay land. Broker, who had resided at this spot all his life and who was completely familiar with it, corroborated the testimony of Filipone, Sayers and Donnelly. He stated that the salt meadow was inclosed by a mound or stone wall which ran to the salt meadow. He testified that this land, now petitioner's, within the embankment or wall had been used as a farm.

The effect of the testimony of all of these witnesses is that the petitioner owns at least some upland at the point in question, thus carrying with it riparian rights and the privilege of constructing

a pier. The city has merely produced the testimony of witnesses who have failed to agree on any one high-water line. All the evidence points to the accuracy of the dock department line, always relied upon by the city before, and this is supported by the further testimony of the other witnesses as to their personal observations as well as the various maps and exhibits in evidence. The finding of this court, based upon all the evidence, is that there was some upland owned by the petitioner behind the point where the pier is to be erected, and that, therefore, riparian rights attach.

The city, apparently not questioning the title to this property in all the years past, as is evidenced by its adoption of the dock department's high-water line and the records of condemnation proceedings in this section, now for the first time in this trial challenges petitioner's title. The testimony shows that this upland about 300 years ago belonged to the town of Westchester, but in the 1700's all of Castle Hill south of the Unionport line was allotted out to the town proprietors, one of whom was Gouverneur Morris Wilkins, who, with his son, purchased and assembled all this land at Castle Hill Point, which included petitioner's land. From Gouverneur Wilkins petitioner shows an unbroken chain of title down to the present time. Gouverneur Wilkins devised to his daughter, Ellen Screven, her heirs and assigns forever, " my farm in Westchester known as Castle Hill Neck." We may accept as a fact that " the farm known as Castle Hill Neck " includes the *locus in quo*. The will of Gouverneur Morris Wilkins was probated in 1871. There was introduced in evidence a copy of a map bearing date of 1836 which on its face purports to be a map of the Wilkins property. This property continued in the possession of Wilkins until his death in 1871, and, as we have heretofore stated, includes the *locus in quo*. Ellen Screven did not long survive her father, for her will was probated later in the year 1871. Under her will the Castle Hill farm was to be divided between her husband, John H. Screven, and her two children. Subsequently the actual partition was had with the result that John H. Screven became the sole owner of that portion of Castle Hill farm which includes the *locus in quo*. In 1896 John J. Screven conveyed all of this property to Pierre W. Briggs. In April, 1897, Briggs conveyed the same property to Thomas H. Given. Given in turn conveyed it to John B. McDonald in June of 1897. In 1903 John B. McDonald conveyed to Mary M. Lozier a tract, carved out of his holding of about seven acres. Mary M. Lozier died in Cleveland, Ohio, in 1907. Her will was probated in the Probate Court of Cuyahoga county, Ohio. The residuary clause of the will disposes of the

property in question in addition to other property. The Lozier property derived from McDonald included the *locus in quo*. By the will of Mary Lozier an undivided one-quarter of the property purchased from McDonald went to William A. Keener, as trustee. Keener died in 1909 and Liston L. Lewis has since been acting as trustee. The remaining three-quarters or fourths of her real property were left in trust to William A. Keener, in trust for her children, Henry A. Lozier, Jr., Bessie Lozier Gregg and Joseph T. Lozier. The will contains a power of sale in the trust deed to dispose of the property. Subsequently, by way of conveyances from the various Loziers, as individuals or through their trustees, the Spedaro Holding Corporation became the owner of the original holding of Mary Lozier. Plaintiff's Exhibit 9 is a full covenant and warranty deed conveying the Lozier property out of the Spedaro Holding Corporation and into the Del Balso Holding Corporation, the petitioner herein. There can be no doubt but that the petitioner has established a good, marketable title running back from the present time to the year 1836, a span of over 100 years.

It would, therefore, appear that petitioner has traced its title to this property back to about 1836, and that prior to that time Wilkins had obtained good title to it as the result of allodial allotments from the town of Westchester. The petitioner having established that it is the record owner of title, such title is good unless the city can show that title is in someone other than petitioner. This the city has failed to do, and there, accordingly, is nothing to overcome the presumption of ownership that exists by reason of the record title and possession having been in the petitioner or its predecessors for over 100 years. The objection by the city to petitioner's title is overruled.

As findings have been waived in this case the decision is in favor of the petitioner, and judgment is directed in its favor for the relief sought. However, if findings are deemed necessary by either party submit same with notice of settlement.